## ASSOCIATED ALMOND GROWERS OF PASO ROBLES et al. v. WYMOND et al.

### No. 6098.

Circuit Court of Appeals, Ninth Circuit.
July 7, 1930.

Rehearing Denied Aug. 26, 1930.

Griffith & Thornburgh and William G. Griffith, all of Santa Barbara, Cal., and Flint & MacKay, Wm. M. Bowen, and C. J. Harrison, all of Los Angeles, Cal., for appellants.

H. B. Daniel, of Los Angeles, Cal., for appellees.

Louis W. Meyers, of Los Angeles, Cal., amicus curiæ.

**2**

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

DIETRICH, Circuit Judge.

This is an appeal from an interlocutory decree entered October 2, 1929, enjoining appellants from the performance of certain acts therein specified and referring the case to a special master for the trial of numerous issues, which will be hereinafter explained. The appellants are the defendants and herein will be so designated. The principal defendant, Associated Almond Growers of Paso Robles, a corporation, will be referred to as the Associated.

Some time prior to 1920 the Associated set on foot a project, the general purpose of which was to acquire title to large tracts of land near Paso Robles, in California, thought to be suitable for the raising of almonds and prunes—more especially the former—subdividing them into small units of approximately ten acres each, and selling the several units to the public. The plan contemplated a contract with each individual purchaser, under the terms of which he agreed to pay a stipulated price per acre—generally $500, but sometimes more—a part of which was to be in cash at the time the contract was executed, and the balance to be paid from time to time in stipulated installments. Upon its part, the Associated was, at its own expense, properly to prepare the land embraced in the unit, plant trees thereon, and in a husbandlike manner cultivate and care for the growing trees for a period of four years. No interest was to be charged on the first half of the purchase price, but the last half was to bear interest from the date of the contract at the rate of 6 per cent. per annum. At his option the purchaser could at any time pay the balance due upon his contract, whereupon he would have the right to a deed conveying to him a good and unincumbered title, and to possession of the premises and the full enjoyment thereof, free from all claims of the Associated, or of any other person; or, after paying one half the purchase price, he could elect to pay the other half by permitting the Associated to remain in possession of and operate the property and retain all products therefrom until such time as the net returns were sufficient to cover such balance, with interest. Apparently the Associated had only a small paid-in capital and did not have complete title to a large part of the acreage it proposed to sell, and soon after the institution of its advertising and selling campaign, for reasons we need not stop to explain, it concluded to establish trust funds to which a part of the receipts from sales was to be diverted for the protection of purchasers, and for their assurance that the Associated would be able to and would convey a good and unincumbered title and would perform its obligations in respect of preparing the land and planting and caring for the trees for the four-year period. Accordingly, it entered into an agreement with its codefendant, the County National Bank & Trust Company, by which it constituted this company a trustee and agreed to pay to it from time to time all receipts from the sales of lands as therein particularly provided, such funds to be held and used as therein stipulated. By the instrument it also conferred upon the trustee wide powers of supervision and control over its operations in carrying forward the project, the purchase of lands, and expenditures in connection therewith.

Thereafter sales were made of approximately 800 units to that number of individual purchasers residing in different parts of the United States. In the course of time some of these became dissatisfied and entered upon a campaign to bring about an organization of all purchasers for the purpose of obtaining relief; it being claimed generally that the contracts had been procured from the several purchasers by false representations touching the suitability of the lands for almond culture and the financial profits which could be realized therefrom, and also that the Associated had not performed its obligations in respect of the planting of trees and their care and cultivation. Furthermore, it was contended that both the Associated and the trustee had been derelict in the performance of their duties imposed by the trust agreement, and that the funds provided for had not been established or the moneys therein had been wrongfully diverted and fraudulently or improvidently spent. Apparently the great majority of purchasers were not interested, but approximately one hundred responded favorably and joined in instituting this action, which is in form a suit in equity and purports to be brought in behalf of not only the one hundred plaintiffs but all other purchasers.

The original bill was filed May 23, 1924. In the following September a motion directed against it was sustained with leave to amend, whereupon, on October 30, 1924, an amended bill was filed with some additional parties plaintiff and the omission of the names of some of the original plaintiffs. On July 16,

1925, defendants' motion to dismiss the amended bill was granted with leave again to amend. On August 13, 1925, without in any wise altering the amended bill, plaintiffs filed an amendment thereto, some of the general averments of which, made to meet the objections sustained by the court, would seem to be wholly inconsistent with certain specific allegations of fact embraced in the verified amended bill. On December 19, 1925, the court overruled defendants' motion to dismiss the bill as thus amended, and on February 17, 1926, they filed their answer. Apparently no further proceedings were taken until March 1 of the following year, when, upon application of the defendants, the court made an order restraining plaintiffs from "further circularizing" concerning the cause, the court, or the parties, during the pendency of the suit. On the same day the taking of testimony began, and at the outset counsel for defendants interposed certain objections to the reception of any evidence, which were denied, and moved for a rule requiring each plaintiff to elect whether he would rescind his contract of purchase because of the alleged frauds or would affirm the same and claim damages. Deferring final disposition of this motion, the court intimated that sooner or later such an election would have to be made; and subsequently, prior to final submission, all the plaintiffs elected not to rescind but to affirm and demand damages. This election was made immediately following the taking of the evidence, whereupon defendants renewed their objections to the granting of any relief, which had been repeatedly interposed at various steps of the proceedings. These, in substance, were that neither the pleadings nor the evidence exhibited a cause of action cognizable in equity, that there was a misjoinder of parties plaintiff, and that in reality each plaintiff was seeking to recover separate damages for the alleged fraud by which he was induced to enter into his contract of purchase, in which no other plaintiff had any pecuniary interest, and in respect of which the defendant bank had no responsibility; or for a breach by the Associated of such contract, relief of a legal nature for which there is a plain, speedy, and adequate remedy at law. Such objections, held to be valid upon the defendants' challenge to the original bill and again upon a like challenge to the amended bill, but apparently denied when interposed after the amendment to the amended bill was filed, the court overruled.

Just when the taking of the evidence was concluded does not clearly appear, but on May 25, 1928, the court filed a statement of its conclusions with a memorandum for the preparation of an interlocutory decree, but for some reason such decree was not filed until sixteen months later. Therein the court recites findings to the effect that the representations of defendants concerning the soil of *"some"* of the lands sold were false, that there are *"areas"* upon which almonds cannot be profitably grown, and that it is not true that, as represented by defendants, an almond orchard, after reaching the age of eight and one-half years, will make a net return of $2,500 or $3,000 per annum, and that the Associated had sold to divers purchasers worthless and unproductive land and cultivated and replanted the same at the expense and to the damage of all purchasers. Explanatory of this last finding is a further statement, which, as will be seen, is not supported by the terms of the contracts, that all the parcels of land "were sold and operated" by the Associated "as a unit and co-operative enterprise," and that every purchaser is interested in the development and cultivation of all the lands of the Associated. Following the statement "that it is not advisable to appoint a receiver at this time, *but that it may become so later,*" is the decretal matter which is too voluminous to be set out in detail. It will suffice to say that by the decree a special master is appointed with directions to give notice to every one of the eight hundred purchasers of the time and place when he may appear and make proof of any claim he may have against the Associated, legal or equitable; that upon such hearing the master is directed to take evidence and to determine the amount of any such claim, whether it be based upon the alleged fraudulent inducement to enter into the contract of purchase, or a breach of the contract to cultivate the land and care for the trees, or the alleged misapplication of the funds of the Associated in the cultivation and planting of units which were, in fact, unsuited to almond culture, or upon some other ground. And it is further provided that each of the purchasers shall "have a vendee's lien upon the lands of the defendants referred to and described in the amended bill of complaint, and upon the moneys paid by such purchaser on account of his purchase or contract and now on deposit or in trust with the defendant" trustee, "to secure, and for the repayment to such purchaser of whatever he may have paid on his contract, * * * and such additional damages as he may be able to prove that he has sustained by reason of the wrongful and fraudulent acts of defendants." In

short, under this head it is in effect decreed that every purchaser, whether now a plaintiff or whether he shall later appear in response to the notice to be given by the special master, may make proof of whatever grievance he has against the Associated and be awarded damages on account thereof, and if he has made full payment of the purchase price of his land, he is to be given an individual judgment and lien therefor, or if he has not made payment of the purchase price, the amount of damages awarded to him is to be applied to the reduction or discharge of the amount due from him on his contract, or if he has taken a deed and given a note and mortgage, the amount is to be applied in the reduction or discharge thereof.

It is also directed that the defendants, Associated, Fred D. Jackson, its manager, and the trustee make a full accounting of all moneys received and all disbursements made from the beginning of the enterprise. They are enjoined from disbursing any moneys received from the purchasers of land (that is, not only moneys received from the one hundred plaintiffs, but from the seven hundred other purchasers who had up to that time manifested no interest in the suit), except for taxes, matured bonded indebtedness, and for "the actual, reasonable and necessary expenses of cultivating, caring for, managing, harvesting and marketing almonds or other crops now growing upon said lands," and certain accrued attorney's fees. And they are specifically enjoined from paying anything at all, directly or indirectly, to Jackson, the manager of the Associated, or to one Reinert, who was not then a party to the suit. And the defendants are further enjoined from taking any proceedings or doing any act for the purpose of forfeiting or terminating any contractual rights not only of plaintiffs, but of any of the seven hundred purchasers who are not parties.

Under any debatable theory of plaintiffs' rights, we are of the opinion the decree is too broad, but in the view we take of certain underlying considerations, questions of detail need not be discussed. Unless supported by the trust agreement hereinbefore referred to, the entire framework of the case must fall. In the absence of that feature, there is no community of interest between the several plaintiffs and no common ground upon which they can join in bringing a single action, and there is no basis for the exercise of equity jurisdiction. The contracts of purchase were several, and, indeed, they were not all of substantially the same import. Each purchaser was buying a separate tract of land; he had no pecuniary interest in any other tract, nor did any other purchaser have any such interest in the unit covered and described in his contract. It follows that if his tract was adapted to almond culture, as represented, and was by the Associated improved and developed in the manner and to the extent called for by his contract, and he was required to pay no more than the stipulated price, and he acquired or was tendered a good and unincumbered title, he got what he contracted for and has no grievance. It is no pecuniary concern of his that some other purchaser may have been cheated or made the victim of some species of unfair dealing, either in connection with the execution of the original contract or, as is alleged in respect of some of the purchasers, subsequently. If, by fraud, any purchaser was induced to enter into the original contract or later by deceit, as is alleged, was induced to enter into a new and less favorable contract, he has a plain remedy at law, and that would be a distinct individual right in which no other person has any actionable interest. Though by their form of pleading in their amended complaint, and sweeping averments in the nature of conclusions in the amendment thereto, wholly inconsistent with some of the specific averments of the amended bill, plaintiffs have sought to obscure this aspect of the case, the fact remains that in reality they are seeking in a single suit in equity to try out a hundred or more distinct actions at law and procure what in effect would be that number of money judgments, each exclusively in favor of one individual plaintiff. That being true, not only, in this aspect of the case, is there a misjoinder of parties plaintiff and defendant, but the complaint, besides being multifarious, is not of equitable cognizance. The defendant association cannot thus be deprived of its constitutional right to trial by jury and, touching such causes of action, it is not shown that the other defendants have any liability. There is no warrant in any one of these individual contracts of sale for the finding that each tract so sold to an individual purchaser was to constitute a part of a co-operative enterprise, or that any purchaser is pecuniarily interested in the development or cultivation of any lands other than those covered by his own contract. If, in practice and for their convenience, the several purchasers thereafter authorized or permitted the Associated to cultivate the lands and handle them, in large tracts or units, such an arrangement was permissive and not obligatory. There

would be no basis for contending that under the contracts the Associated is bound so to operate the lands or that any purchaser is without the legal right at any time to withdraw his unit from such a plan of operation and handle it himself independently of all others.

It remains to consider whether to any extent the suit finds support in the trust arrangement. The only reference, direct or indirect, in the individual contracts of sale to a trust is in the paragraph thereof providing that the Associated "shall deposit with the Trustee of its development fund certain sums of money to be held and expended by said Trustee for the development of said land, in accordance with the terms hereof. Such sums of money to be in the amounts and paid at the times sufficient to insure full development and care of said tract, in accordance with the terms of this contract." However, the agreement between the Associated and the defendant trustee is broader in scope and, in so far as it purports to be for their benefit, the purchasers may ask for its enforcement. It establishes not only (1) a development fund in which were to be deposited with the trustee "necessary money for the improvement of said property, and planting and care of the trees thereon, in accordance with the agreements of sale," but (2) a land fund "for the benefit and protection of purchasers," the moneys deposited therein to be used in paying for land purchased by the Associated for the project, and also all taxes and other liens thereon, and (3) a surplus fund, also "for the benefit and protection of purchasers," as well as the "benefit of the Association."

All the receipts of the Associated were to be deposited with the trustee, or to its credit. Of such receipts there was to be allocated to the development fund $56.50 per acre of the initial payment on any contract of sale imposing an obligation on the Associated to plant; and thereafter, a certain specified part of each monthly payment, under the contract of purchase, was to be so allocated, until the aggregate equaled $100 per acre for the tract sold, with the further provision that in case the actual cost of development should exceed $100 per acre, the fund was to be increased in the manner prescribed.

As to the land fund, the declaration of trust is vague and uncertain in the extreme, the only provision being that the fund should "at all times be of a sum sufficient to meet" all the association's obligations upon contracts under which it acquired lands. And in that connection the declaration for the first time mentions a sales fund into which, after meeting the demands of the two funds just referred to, there were to be paid "various sums from time to time which shall not exceed twelve (12%) per cent upon the total sales." And then referring to the surplus fund, the agreement goes on to say that the balance of the Association's receipts remaining after satisfying the other three funds is to be deposited with the defendant bank to the credit of the association, to be used by it for its ordinary and proper expenditures, with the proviso, however, that at any time when in its opinion any one of the other three funds was deficient, the trustee should have the right and authority to make good such deficiency out of this fund.

The purposes of the first two funds are clear, and in their creation and maintenance each purchaser would, up to a certain time, have a substantial interest. Manifestly, that interest in the first would terminate upon the completion of the "development" of the tract purchased by him in full compliance with his contract, and in the second, upon the conveyance to him by the Associated of a good and unincumbered title.

As to the so-called sales fund, there is no intimation in the declaration that it was intended for the benefit of purchasers or that at any time they would have any interest therein. And in respect of the surplus fund the agreement expressly provides that the moneys therein should be used by the Associated "for its ordinary and proper expenditures," and, with the approval of the trustee, they might even be distributed to its stockholders as dividends. But there is the further provision, already noted, that the trustee might at any time divert all or any part thereof to any one of the other funds when in its opinion such other fund proved to be insufficient for the purposes for which it was created. Thus holders of outstanding contracts of purchase may have a contingent interest in that fund as well as in the first and second. But such interest would accrue only when and if the trustee concluded, or, acting reasonably and in good faith should conclude, that there was a deficiency in the development or the land fund.

With this analysis extended discussion of general questions of law is not thought to be necessary, and we do little more than to state our conclusions. It is difficult to escape the view that the primary purpose of the action

6

was to recover separate judgments in favor of the several plaintiffs on account of the alleged false representations by which they were induced to enter into their individual contracts of purchase; at least, that is one of the principal purposes and is one of the outstanding objectives of the interlocutory decree. But such a cause of action is not within the scope of and has no relation to the trust. In that aspect there is not only a misjoinder of parties plaintiff and defendant, but the bill is multifarious and exhibits no basis for equitable relief.

Upon the other hand, a court of equity is competent and open to extend relief in the enforcement of a trust and in the protection of trust funds, including an accounting; and here any one of the purchasers, having a present interest in such funds, may seek the aid of the court in enforcing the declaration of trust in so far as it pertains to such interest.

The averments in the pleading and the provisions in the decree touching the legal and equitable causes of action are so interwoven that we find it impracticable to determine what parts, if any, of the decree can be sustained, and therefore it will be reversed as a whole with directions to take further proceedings not out of harmony with the views herein expressed. And in the interest of clarity and economy we add that plaintiffs should be permitted and directed to reframe their bill so that it will relate exclusively to the subject-matter of the trust as we have defined it, make certain what, if any, interest plaintiffs have therein, show with reasonable detail in what particulars the defendants have failed to discharge their obligations in respect thereof, or threaten to violate it, and disclose what efforts, if any, plaintiffs have made to secure compliance with the declaration prior to or aside from their application to the court for assistance. Upon issues so presented, if sufficient in law, the evidence already taken, in so far as it is material and pertinent, may be considered, with the right to either party to supplement it.

And we should further add that relief by temporary injunction in such a case should be granted with great caution. The attempt to operate a project of this character by injunction is extremely perilous and puts in jeopardy the interests of hundreds of purchasers and others who are not parties to the suit. For illustration, under the present decree it would seem to be highly incongruous

to leave with the association the responsibility of operation and at the same time to restrain it from paying any compensation to its manager. If, upon full consideration, the court is convinced that in respect of subjects of pecuniary interest to the plaintiffs, management by the Associated, as supervised and controlled by the trustee, is likely to be incompetent, wasteful, or dishonest, it would seem that a receivership would promise greater safety and efficiency than an injunction.

Reversed.